**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| | : |
| **Plaintiff,** | : **Case No. 03-CV-63** |
| | : |
| **v.** | : |
| | : **JUDGE MARBLEY** |
| **ROGER D. BLACKWELL,** *et al.***,** | : |
| | : **Magistrate Judge Kemp** |
| **Defendants.** | |

**OPINION AND ORDER**

**I.  INTRODUCTION**

This enforcement action filed by the United States Securities and Exchange Commission (the "SEC" or the "Commission") involves alleged insider trading in the stock of Worthington Foods, Inc. ("Worthington").  The SEC alleges that Defendant, Roger D. Blackwell ("Blackwell"), a director of Worthington, provided illegal tips to close friends and family members prior to the October 1, 1999 announcement that the Kellogg Company ("Kellogg") had entered into an agreement to acquire Worthington.  The SEC contends that these tips allowed the other named Defendants to profit in violation of federal securities laws.  Jurisdiction is proper under Sections 21 and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78u and 78aa.  In Count I of its complaint (the "Complaint"), the SEC alleges that Blackwell tipped his co-defendants in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  In Count II, the SEC alleges that Blackwell failed to file reports of ownership and change in beneficial ownership as required by

1

Section 16(a) of the Exchange Act, 15 U.S.C. § 78(p)(a), and Rules 16a-2, 17 C.F.R. §

240.16a-2, 16a-3, 17 C.F.R. § 240.16a-3, and 16a-8, 17 C.F.R. § 240.16a-8, thereunder.

This matter is currently before the Court on the SEC's Motion for Partial Summary

Judgment. The Commission is seeking to use the doctrine of collateral estoppel against

Defendants Blackwell, Kelly Hughes ("Hughes"), and Kevin Stacy ("Stacy") to prevent them

from relitigating their alleged liability for violating Section 10(b), which the SEC contends has

already been decided in a related criminal action. The Commission also asks this Court to

impute Blackwell's and Hughes' illegal conduct to their co-defendant, the Blackwell Pension

Plan Trust (the "Trust")[1], and grant summary judgment with respect to Count I against the Trust

on this basis. Additionally, the SEC asks this Court to grant summary judgment against

Blackwell on Count II because the Commission alleges that there are no material facts left in

dispute regarding whether Blackwell failed to file the appropriate forms as required by Rule

16(a). Finally, the SEC requests that this Court grant permanent injunctions against Defendants[2]

and order that they disgorge their profits and pay prejudgment interest. For the reasons stated

herein, the Court **GRANTS in part** and **DENIES in part** the SEC's Motion for Partial

Summary Judgment.

## II. BACKGROUND

---

[1]The actual Defendant is "Roger Blackwell in his capacity as trustee for the Roger Blackwell & Associates Pension Plan Trust." "Blackwell Pension Plan Trust" is the short form adopted by the Parties.

[2]The SEC's Motion pertains only pertains to Defendants Blackwell, Hughes, Stacy, and the Trust. The SEC reserves the right to try Defendants Dale Blackwell, Christian Blackwell, Arnold Jack ("Jack"), and Black-Jack Enterprises ("Black-Jack") separately.

**A. Facts**

Some of the following facts are taken from the SEC's Complaint.

Defendant Roger Blackwell is a nationally recognized expert in consumer behavior and marketing. He is a high-profile marketing professor at The Ohio State University and is a member of the boards of directors of several public and private companies. From 1992 to November 29, 1999, Blackwell was a member of the board of directors of Worthington (the "Board"), which, at the time, was a publicly traded corporation based in Worthington, Ohio, that produced meat alternative food products made from soy and wheat proteins. Worthington's securities were registered under Section 12(g) of the Exchange Act. Its common stock was traded on the Nasdaq National Market, and its options were traded on the Philadelphia Stock Exchange.[3] Blackwell was also, at all relevant times, the president and sole owner of Blackwell & Associates, a consulting firm; the trustee of the Trust; and a general partner and 50% owner, along with Defendant Jack, of Defendant Black-Jack, an investment partnership.

On July 8, 1999, representatives from Kellogg approached Worthington's Chairman, President, and Chief Executive Officer, Dale Twomley ("Twomley"), to discuss the possibility of a business combination. On July 16, 1999, top Kellogg officials met with Twomley and other Worthington officials to execute a confidentiality agreement. On July 20, 1999, during a regularly scheduled Board meeting, Twomley informed the Board of the ongoing discussions

---

[3]At all relevant times, Worthington had a policy that prohibited employees and directors from trading in Worthington securities while in possession of material, non-public information. Worthington's policy also prohibited employees and directors from using material non-public information for personal benefit. In addition, Worthington required all executives and directors to seek approval prior to engaging in transactions in Worthington securities. As a member of the Board, Blackwell was aware of, and was bound by, these policies.

with Kellogg.  At that meeting, the Board authorized management to engage an investment banker.  Blackwell attended this and all other Board meetings in July, August, and September 1999, appearing either in person or by telephone.

On August 10, 1999, Twomley and Worthington officials discussed pricing the deal at $26.08 per Worthington share.  In August and September 1999, Worthington's stock was trading in the $11 15/16 to $14 3/8 range.  On August 11, 1999, during a special telephonic meeting, the Board authorized the negotiation of a definitive merger agreement.  Soon thereafter, Worthington formally engaged an investment banker and began its due diligence process.

On August 26, 1999, during a special telephonic meeting, the Board authorized management to pursue an all cash transaction.  On August 30, 1999, Kellogg delivered to Worthington an initial draft of the merger agreement.  On September 8, 1999, the Board met with legal counsel to review the merger agreement.  On September 23, 1999, Twomley and Kellogg officials agreed to a price of $24 per share for Worthington stock.  The next day, on September 24, 1999, the Board held a special meeting during which the directors authorized management to complete the definitive agreement.  Copies of the merger agreement were sent to the Worthington directors on September 27, 1999.  On September 29, 1999, the Board met and approved the merger agreement.  The parties executed the merger agreement by the end of the day on September 30, 1999.  On the morning of October 1, 1999, the parties issued a press release announcing the merger agreement in which Kellogg would pay $24 for each share of Worthington stock.  On that day, Worthington's stock price closed at $23 1/16, up $8.75 or 61.4%, from the previous day's closing price.

The SEC alleges that Blackwell illegally provided material non-public information

4

regarding Worthington's merger with Kellogg to family members and friends who, in turn, profited by illegally trading on this information.

Defendant Hughes has worked for Blackwell & Associates for ten years and is allegedly a close confidant of Blackwell. She typically makes investment decisions jointly with her husband, Defendant Stacy. In the six month period prior to September 1999, Hughes and Stacy had not placed any trades in the stock market. While they had previously invested in Worthington stock, they had only made three small purchases, the most recent in February 1999 for 250 shares. On August 31, 1999, Blackwell allegedly met with Hughes as part of Hughes's year-end performance review. During this and additional conversations in September 1999, Blackwell allegedly disclosed to Hughes material non-public information concerning Kellogg's proposed acquisition of Worthington. Shortly after the August 31, 1999, conversation and at various points in September, Hughes allegedly disclosed to Stacy material non-public information concerning Kellogg's proposed acquisition of Worthington.

On September 1, 1999, Hughes and Stacy purchased 180 shares of Worthington stock. They purchased an additional 10,106 shares over a period dating from September 20 to September 30, 1999. They spent a total of $129,655.33 on the Worthington stock. When they sold these shares, on October 4 and 5, 1999, their proceeds totaled $234,609.80. Hughes and Stacy's investment in Worthington stock was their largest investment ever in a single stock. The amount of the investment equaled 150% of their combined annual income. The investment utilized substantially all of Hughes and Stacy's liquid assets.

Defendant Roger Blackwell is sole trustee of the Trust, of which both his now ex-wife Kristina and Defendant Hughes are direct beneficiaries. Kristina Blackwell and Defendant

Hughes each had authority to make trades on behalf of the Pension Plan Trust.  To the extent the pension plan funded by the Trust might be overfunded, Blackwell & Associates owns the excess funds; to the extent it might be underfunded, Blackwell & Associates is responsible for providing the remainder.  On September 27 and 29, 1999, Defendant Hughes caused the Trust to purchase 5,300 shares of Worthington stock for a total cost of $61,028.95.  These were the first trades Hughes had ever placed on behalf of the Trust.  On October 4, 1999, the Trust sold the Worthington stock for a profit of $57,023.29.  There is no evidence that Blackwell disclosed these purchases or sales to the SEC pursuant to Rule 16(a).

Blackwell and Defendant Jack have been business associates and friends for 30 years. Jack, a lawyer, has represented Blackwell in the past.  The two men have jointly owned real estate and are partners in Defendant Black-Jack.  On September 7, 1999, at 1:43 p.m., Defendant Jack made a seven-minute phone call to Blackwell's office at Blackwell & Associates. Blackwell allegedly disclosed material non-public information concerning Kellogg's proposed acquisition of Worthington to Jack during this call.  Immediately following the call, at 1:50 p.m., Jack placed a five-minute call to his Advest broker in which he placed a buy order for 1,000 shares of Worthington stock.  During the next two days, Defendant Jack purchased an additional 1,500 shares of Worthington stock.  In late September 1999, Blackwell used frequent flier miles to provide Jack and his wife with plane tickets to Europe.  On September 22 and 23, 1999, Blackwell and Jack stayed at the same hotel in Monaco and dined together.  While they were in Monaco, Blackwell allegedly again provided material non-public information to Defendant Jack concerning Kellogg's proposed acquisition of Worthington.  On September 27, 1999, Jack purchased an additional 500 shares of Worthington stock.  Jack spent a total of $37,386.15 on

Worthington stock in September 1999.  He sold his 3,000 shares on October 1 and October 12, 1999, deriving a profit of $31,146.35.

Blackwell and  Jack each own 50% of Defendant Black-Jack.   Blackwell has reported his share of the Black-Jack profits on his tax returns each year.  Blackwell's secretary has testified that Blackwell receives brokerage statements from Black-Jack.  On September 8, 1999, Defendant Jack bought 2,500 shares of Worthington stock on behalf of Defendant Black-Jack.  On September 9, 1999, Jack purchased an additional 500 shares of Worthington stock on behalf of Black-Jack.  The total cost to Black-Jack of these purchases was $30,187.13.  When the shares were sold, on October 1 and October 4, 1999, Black-Jack realized profits of $26,883.87.  There is no evidence that Blackwell disclosed these sales or purchases to the SEC pursuant to Rule 16(a).

### B.  Procedural History

On January 21, 2003, the SEC commenced an action against Blackwell, Dale J. Blackwell, Christian D. Blackwell, Hughes, Stacy, Arnold Jack , Black-Jack Enterprises, and the Trust.  The SEC accused these Defendants of various violations of the federal securities laws prohibiting insider trading.  According to the SEC, based on illegal tips made by Blackwell that Worthington Foods, Inc. planned to merge with Kellogg, these Defendants purchased and traded shares of Worthington stock in the weeks before the merger, deriving significant profit therefrom.

On August 26, 2004, a grand jury returned indictments against Blackwell, Hughes, Stacy, Jack, Justin Voss, Black-Jack, and Correctional Officer Smith (the "Criminal Action").  The indictment contained various charges including conspiracy to defraud the United States,

obstruction of proceedings before governmental agencies, and violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  *See U.S. v. Blackwell, et al.*, No. 2:04-cr-134 (S.D. Ohio) (Graham, J.).

After this Court denied Defendants' pre-answer motions, including Defendants' motions to dismiss, the Defendants answered the SEC's complaint and the SEC filed motions to strike several of Defendants' affirmative defenses, which the Court subsequently granted.  Following the filing of the Rule 26(f) report on June 27, 2003, the parties conducted discovery until May 2005.  The SEC then deposed Defendant Dale Blackwell. Further, the SEC had already deposed a number of "key witnesses" including Tina Blackwell, Gertrude Stephan, Alfred Stephan, Hughes, and Blackwell. The SEC has, by its own admission, conducted all discovery and preserved all the evidence that it considers necessary to bring its civil cases.

On November 15, 2004, Defendants filed a joint motion to stay these proceedings, which the SEC did not oppose because of the pending Criminal Action involving Blackwell, Hughes, Stacy and other Defendants.  *See U.S. v. Blackwell, et al.*  On May 23, 2005, this Court granted Defendants' motion to stay pending the resolution of the criminal case.

The criminal trial lasted from May 17, 2005 through June 20, 2005.  On June 20, 2005, a jury convicted Blackwell, Hughes, and Stacy on numerous counts of conspiracy to commit insider trading, insider trading, conspiracy to obstruct justice, making false statements in violation of 18 U.S.C. § 1001, and obstruction of the SEC's investigation.[4]  The jury acquitted Defendants Arnold Jack, Black-Jack, and Justin Voss.  The Trust was not a defendant in the Criminal Action.

---

[4]The jury also adjudged Blackwell, Hughes, and Stacy not guilty on certain counts.

On December 15, 2005, after denying Defendants' joint motion for a new trial, U.S. District Judge James L. Graham sentenced Defendants Blackwell, Hughes, and Stacy. Blackwell received six years imprisonment and a $1 million criminal fine.[5] Hughes received 33 months imprisonment, and Stacy received 27 months imprisonment. Judge Graham also fined Hughes and Stacy each $53,443.00.

On January 3, 2006, a three-judge panel of the Sixth Circuit Court of Appeals denied bail pending appeal for Blackwell, Hughes, and Stacy. The Court put the appeal on an expedited briefing and submission schedule, but noted that "[t]he Defendant has not demonstrated that this appeal raises a substantial appellate issue that would require his release on bail pending appeal." Defendants are currently incarcerated.

On December 21, 2005, the SEC filed a Motion to Lift the Stay of the civil case. Defendants Blackwell, Hughes, and Stacy timely responded. On February 22, 2006, this Court lifted the stay and permitted the SEC to proceed with its civil case while Defendants' criminal appeals are pending.

On March 24, 2006, the SEC filed this Motion for Partial Summary Judgment against Defendants Blackwell, Hughes, Stacy, and the Trust ("Defendants"). The SEC seeks to use Defendants' criminal convictions to preclude Defendants from relitigating the issue of their liability for Rule 10(b) violations. The SEC also asks this Court to grant summary judgment on Count II, as it alleges that there are no genuine issues of material facts regarding Blackwell's alleged failure to comply with Rule 16(a). The SEC requests a permanent injunction against

---

[5]This fine represents an upward departure from the sentencing guidelines (guidelines recommends between $12,500 to $125,000) which required Judge Graham to make special findings.

9

Defendants, ordering them to comport with the requirements of Rule 10(b), and a permanent

injunction against Blackwell, ordering him to comply with Rule 16(a).  Additionally, the SEC

asks this Court to enter orders against Hughes, Stacy, and Blackwell, jointly and severally, for

$102,954,72 in disgorgement and $51,363,49 in prejudgment interest, and the Trust and

Blackwell, jointly and severally, for $57,023.29 in disgorgement and $27,906.47 in prejudgment

interest.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c).  The movant has the burden of establishing that there are no genuine

issues of material fact, which may be accomplished by demonstrating that the nonmoving party

lacks evidence to support an essential element of its case. *Celotex Corp. v. Vatrett*, 477 U.S. 317,

322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir.

1993).  In response, the nonmoving party must present "significant probative evidence" to show

that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip

Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute

is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury

could return a verdict for the non-moving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242,

248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (concluding that summary judgment is appropriate when the evidence could not lead the

trier of fact to find for the nonmoving party).

10

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex, 477 U.S. at 324; Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1995).

## IV.  LAW and ARGUMENT

### A.  Count I Against Blackwell, Hughes, and Stacy

The government seeks summary judgment on Count I against Blackwell, Hughes, and Stacy based on their convictions in the Criminal Action.

The law is clear "that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951).  In fact, in several prior cases, the Commission has used collateral estoppel against 10b-5 defendants who have been previously convicted on criminal charges. *See, e.g., SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994); *S.E.C. v. Gruenberg*, 989 F.2d 977 (8th Cir. 1993).  As some courts have noted, the prevalence of estoppel in civil cases following their criminal counterparts is due in part to the court's desire to avoid inconsistent verdicts in light of the higher burden of proof required in the prior criminal case.  *See Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38, 43 (2d Cir. 1986).

The Sixth Circuit has held that a decision of a federal court is entitled to collateral effect if a four part test is met: (1) precise issue raised in present case must have been raised and actually litigated in prior proceeding; (2) determination of issue must have been necessary to

11

outcome of prior proceeding; (3) prior proceeding must have resulted in final judgment on the

merits; and (4) party against whom estoppel is sought must have had full and fair opportunity to

litigate issue in prior proceeding.  *See, e.g., Smith v. SEC*, 129 F.3d 356, 362 (6th Cir. 1997).

### 1.  Issues Must Be Identical and Actually Litigated in the Prior Criminal Action

Before this Court may enjoin Defendants from litigating their civil liability under Section

10(b) on the ground that it would be duplicative, it must determine that the Criminal Action is

"materially on all fours" with this case; the "issues must have such identity that determination in

one action leaves little or nothing to be determined in other." *Smith*, 129 F.3d at 361 (citations

omitted).

The statutory elements for civil and criminal Section 10(b) and Rule 10b-5 violations are

nearly identical.  *See, e.g., SEC v. Freeman*, 290 F.Supp.2d 404 (S.D.N.Y. 2003).  The criminal

indictment and the civil complaint against Defendants allege the same insider trading conduct

based on the same set of underlying facts.  Courts in similar situations have compared the

criminal indictment to the civil complaint to determine whether the actions involved identical

issues.  *See, e.g.*, *Gruenberg*, 989 F.2d at 978.  The SEC produced a four-page exhaustive list of

facts that it alleged in both the criminal indictment and the civil complaint.  Based on these

identical facts, the jury concluded that Defendants violated Section 10(b) of the Exchange Act

and Rule 10b-5 thereunder, the exact statutory basis for Count I in the civil complaint.

Defendants claim that the criminal trial and the civil complaint do not involve identical

issues.  Defendants assert that the presence of additional defendants, witnesses, and charges in

the Criminal Action somehow makes the issues involved in the Criminal Action different from

those in this case.  While the criminal indictment contains additional parties and charges, the jury

12

specifically returned guilty verdicts on counts 2 through 15 of the indictment, the Section 10(b)

offenses.  There is no case law that supports the proposition that a criminal indictment must

match a civil complaint exactly in terms of parties and claims for there to be a preclusive effect.

*See SEC v. Namer*, 2004 WL 2199471 at *3, (S.D.N.Y. Sept. 30, 2004) (finding collateral

estoppel appropriate in a securities fraud case where a criminal jury convicted defendant of

violating Section 17(a) of the Securities Act but civil complaint only alleged violations of

Section 10(b) because of substantial factual overlay between the claims).

Furthermore, there is no evidence that the jury somehow imputed evidence from one

count or party to another.  In fact, there is evidence to the contrary.  The jury convicted

Blackwell, Hughes, and Stacy but acquitted three other defendants.  This demonstrates that the

jury carefully considered the evidence and parsed it between the different parties and charges.

Because the indictment and the civil complaint involved the same conduct with respect to

the 10(b) violations, this Court concludes that the issues underlying Count I of the SEC's civil

complaint are identical to the issues in counts 2 through 15 in Defendants' criminal trial for the

purposes of collateral estoppel.

**2.  Determination of Issues Must Have Been Necessary to the Outcome of the Criminal Action**

Counts 2 through 15 of the indictment charge the Defendants with violating Section

10(b) and Rule 10b-5.  Thus, the jury necessarily must have concluded that Defendants violated

10(b) and 10b-5 for it to have found Defendants guilty of violating counts 2 through 15.

**3.  Criminal Action Resulted in a Final Judgment on the Merits**

A criminal conviction and sentence is a final judgment on the merits.  *See, e.g., United*

*States v. Jolivette*, 257 F.3d 581, 583 (6th Cir. 2001).  Defendants argue that because they have

an expedited appeal pending before the Sixth Circuit, this Court should either exercise its

discretion not to apply estoppel or stay its decision on the SEC's Motion until after the appeals

process is complete.  As a preliminary matter, the Court notes that the Sixth Circuit, in placing

Defendants' appeal on the expedited schedule, commented that the Defendants had not raised a

substantial appellate issue.  Moreover the weight of the authority rejects Defendants'

recommended approach.  The majority of courts have concluded that a pending criminal appeal

does not bar the court from applying principles of claim preclusion to the plaintiff's case.  *See*

*Smith*, 129 F.3d at 362 (noting that the pendency of an appeal does not preclude a judgment's res

judicata effect); *Namer*, 2004 WL 2199471 at * 8 ("But the fact that [defendant's] criminal

conviction is currently under consideration by the United States Court of Appeals for the Sixth

Circuit does not foreclose the prior judgment from having preclusive effect."); *SEC v. Pace*, 173

F. Supp. 2d 30, 33 (D.C. 2001) ("The fact that Pace's appeal from his conviction is still pending

does not affect the application of collateral estoppel."); *United States v. Intel Brotherhood of*

*Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 905 F.2d 610, 621 (2d Cir.

1990) ("The pendency of a criminal appeal generally 'does not deprive a judgment of its

preclusive effect'") (citations omitted).

　　　　Allowing Defendants to avoid the preclusive effect of the Criminal Action until their

appeal is finalized would halt the process of justice.  Defendants have the ability to delay their

criminal appeals for years by requesting en banc hearings, petitioning the U.S. Supreme Court

for certiorari, and filing habeas corpus petitions.  It is proper for this Court to apply collateral

estoppel if the requisite four-prong test is met.  In the event that their criminal conviction is

14

overturned, Defendants may invoke Rule 60(b) of the Federal Rules of Civil Procedure and obtain relief from the civil judgment.

### 4. Defendants Must Have Had A Full and Fair Opportunity to Litigate the Issues in the Criminal Proceeding

In determining whether Defendants have had a full and fair opportunity to litigate the issues, the Court must examine whether Defendants had the chance to present evidence and mount a defense against the criminal charges. *See, e.g., SEC v Tandem Management*, 2001 WL 1488218 at *11 (noting that criminal procedural safeguards are greater than those in civil cases including the presence of a higher burden of proof); *Namer*, 2004 WL 2199471 at *5; *SEC v. Grossman*, 887 F. Supp. 649, 659 (S.D.N.Y. 1995).

The criminal trial lasted twenty days. Defendants placed exhibits into evidence, raised objections, cross-examined the twenty-one witnesses against them, presented opening and closing statements, and testified in their own defense. Despite these facts, Defendants claim that they were not fully permitted to develop a defense. Defendants' criminal appeals set forth all the grounds for their belief that the trial court committed reversible error.[6] None of these procedural considerations has indicated that Defendants were in any way deprived of the ability to mount a vigorous defense to the Section 10(b) charges. The alleged procedural trial errors are appellate issues that are properly left for the Sixth Circuit to address.

---

[6] Defendants assert the following: 1) The court refused to allow certain expert testimony on behalf of the defense into evidence; 2) The court improperly admitted prosecution evidence; 3) The court placed impermissible restrictions on Defendants ability to cross-examine witnesses; 4) The prosecution failed to disclose Brady material; and 5) The prosecution improperly "mouthed" inadmissible evidence to three of the jurors. Judge Graham wrote a lengthy opinion regarding why each of these claims fails and these issues are now before the Sixth Circuit.

### 5.  Judicial Economy and Other Policy Goals of Collateral Estoppel

As a last argument against this Court applying collateral estoppel, Defendants note that the Commission's Rule 10b-5 claims against defendants Dale Blackwell, Christian Blackwell, Arnold Jack, and Black-Jack are still pending and are not subject to this motion for summary judgment.  Defendants argue that the main benefit of collateral estoppel, judicial efficiency, is not present in this case because the SEC will still have to take its case against these absent defendants to trial.  Defendants further argue that courts "routinely" deny preclusion where judicial economy is not manifest.

The Court rejects this argument for three reasons.  First, it is not "routine" for courts to reject collateral estoppel because it does not promote judicial economy.  Nowhere is this fact more evident than in Blackwell's brief, where the only case he cites in support of this argument arises from the District Court for the District of Columbia in 1970.[7]  Second, judicial economy is only one of several policy reasons for applying collateral estoppel.  Another strong reason to apply collateral estoppel is to prevent inconsistent verdicts, especially in cases such as this, where a jury has already rendered a verdict requiring a higher burden of proof.  Third, employing collateral estoppel against Blackwell, Hughes, and Stacy would achieve at least some measure of judicial efficiency.  Specifically, the judicial system would conserve the resources it would otherwise expend in litigating the 10b-5 claims that the SEC has already proven against Blackwell, Hughes, and Stacy at their criminal trial.

The SEC has satisfied the four-prong test for collateral estoppel.  Defendants have not presented this Court with any meritorious policy arguments against applying this doctrine.  As

---

[7]*Hawaiian Paradise Park Corp. v. Becker*, 314 F. Supp. 1133, 1134 (D.D.C. 1970)

such, the Criminal Action against Defendants for violating Section 10(b) and Rule 10b-5 thereunder precludes relitigation of these issues in this case.  Therefore, this Court **GRANTS** summary judgment to the SEC on Count I against Blackwell, Hughes, and Stacy.

### B.  Count I Against the Blackwell Pension Plan Trust

The SEC asks this Court to determine that the Trust violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder as a matter of law and enter summary judgment on Count I against the Trust.  In order to establish liability for insider trading against a tippee, the SEC must show that: "1) Blackwell possessed material, non-public information regarding Worthington; (2) Blackwell disclosed this information to the tippees; (3) the tippees purchased Worthington stock while in possession of the inside information provided by Blackwell; (4) the tippees knew or should have known that Blackwell violated a relationship of trust by relaying the Worthington information; and (5) Blackwell benefitted from the disclosure."  *SEC v. Blackwell*, 291 F. Supp. 2d 673, 696 (S.D. Ohio 2003).

As this Court held above, Blackwell and Hughes are collaterally estopped on Count I, the 10(b) count, of the SEC's complaint.  More specifically, in the Criminal Action, the jury found Defendants guilty of Counts 2 and 7 of the indictment, which covered the September 27 and 30 trades that Hughes made on behalf of the Trust.  The only questions that remain before this Court are whether Hughes' or Blackwell's conduct can be imputed to the trust as a matter of law, and if so, whether the SEC provided enough evidence to satisfy the summary judgment standard against the Trust.

Whether the conduct of an individual can be imputed to a trust in a summary judgment context is a question of first impression for the Court.  The court in *SEC v. Ballesteros Franco*,

17

253 F.Supp.2d 720 (S.D.N.Y. 2003), however, addressed this question in the context of a motion to dismiss.[8]  In *Ballesteros*, defendant Jose Ballesteros ("Jose") was a director of Nalco Chemical Company.  *Id.* at 723-24.  In his capacity as a director, Jose came into possession of certain material, non-public information which the SEC alleged that he tipped to certain other defendants.  One of the defendants the SEC accused Jose of tipping was his brother, Jorge Ballesteros ("Jorge").  *Id.*  Jorge was associated with, but not trustee of, two trusts which traded based on the inside information that Jose tipped to Jorge.  *Id.*

The *Ballesteros* court was faced with the question of whether Jorge's actions could be imputed to the two trusts such that the SEC could state a claim against the trusts for violation of Section 10(b) and Rule 10b-5 thereunder.  The *Ballesteros* court reasoned that trusts, like corporations, act solely through individuals.  The court commented that "a person's knowledge can be attributed to a corporation in connection with actions that person through his control causes the corporation to take."  *Id.* at *728* referencing *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) and *SEC v. North Am. Research and Development Corp.*, 424 F.2d 63 (2d Cir.1970).  Reasoning from this logic, the court held that if an "individual so dominates or controls the activities of some entity such as the trust, the entity may also be held responsible for the same acts committed by the individual."  *Id.*

Examining the complaint, the *Ballesteros* court found that the SEC had alleged enough facts to illustrate that Jorge's "activities and his relationship with the Trust defendants indicates that the Trust defendants were controlled and dominated by Jorge" such that it was appropriate

---

[8]The *Ballesteros* court specifically noted that there was no previous precedent that addressed the question of whether the court could impute an individual's knowledge to a trust.

to impute his conduct to them. *Id.* at 725. Specifically, the court noted that the trusts were established for the benefit of Jorge's close relatives (his mother and wife), that Jorge was the only person to recommend investment advice to the trusts, that his advise was never declined, and that Jorge was either a primary or secondary beneficiary of the trusts' assets. *Id.* As such, the *Ballesteros* court held that trust defendants, like corporations, can held liable for violations of securities laws committed by individuals. *Id.* at 730.

The *Ballesteros* court's logic is sound and well reasoned. It would be poor policy to refuse to impute the knowledge and actions of a trust fiduciary onto that trust. Doing so would allow a trust to benefit through an individual's illegal actions, consequentially benefitting that individual as well. As such, this Court concurs with the reasoning in *Ballesteros* and holds that an individual's conduct can be imputed to a trust.

This holding, however, does not end the inquiry in this case. The SEC still bears the burden of showing that no genuine issues of material fact remain regarding whether Hughes and/or Blackwell "so controlled or dominated" the Trust that it is appropriate for this Court to impute their knowledge onto it.

The SEC has proffered substantial evidence that Hughes exercised significant control over the Trust. Hughes had complete trading authority over the Trust in 1999 and did not need the approval of Blackwell to conduct a trade. She had investment control over the Trust since 1995. She was the *only* individual to make investment decisions on behalf of the Trust in 1999. Hughes and Blackwell's now ex-wife were the only two vested beneficiaries of the Trust at the time of the illicit Worthington stock trades. Additionally, Blackwell & Associates, Hughes' employer, was entitled to keep any amount of money that the Trust was overfunded. In the

19

Criminal Action, the jury, by convicting Defendants on counts 2 and 7, necessarily concluded that on two different occasions in September 1999, Hughes violated Section 10(b) by trading on behalf of the Trust, after Blackwell, sole trustee of the Trust, tipped her about the Worthington merger.

Defendants do not dispute many of the facts above. Instead, they proffer two arguments. First, Defendants argue that Hughes did not control the pension plan. In support of this argument, Defendants cite two facts. Defendants point out that the SEC's complaint notes that the 1999 trade was the first time that Hughes had ever traded on behalf of the pension plan. They also remark that Theresa Tailford was the appointed administrator of the pension plan and had various duties including determining plan participants' benefits and calculating the level of plan funding. Defendants' first argument in unavailing. Hughes clearly had the highest level of control over the trading decisions of the Trust during the period in question. The fact that Ms. Tailford was in charge of certain routine administrative tasks does not change this fact.

Second, Defendants contend that the SEC failed to plead "control person liability" or establish that Hughes "controlled" the Trust as defined in various cases and in Section 20(a). In making this argument, Defendants misconstrue *Ballesteros*. Under Section 20(a), the SEC must demonstrate a primary violation of securities laws by the controlled party (the Trust) and the control person must have directly or indirectly controlled the entity that is liable. *See PR Diamonds, Inc. v.* Chandler, 364 F.3d 671, 696-97 (6th Cir. 2004); *SEC v. Smith*, 2005 WL 2373849 at *10. This section is most commonly employed when a corporation has committed a securities violation and the SEC is attempting to hold a CEO liable for the actions of the corporation. *See, generally, id.*

The *Ballesteros* court did not discuss control person liability under Section 20(a). Section 20(a) is designed to hold an individual liable for secondary violations of Section 10(b). The *Ballesteros* court imputed an individual's conduct to a trust for primary violations of Section 10(b). The SEC is seeking to hold the Trust liable for primary violation of securities laws. Thus, any analysis under Section 20(a) is inapplicable in this case.

The Commission has established that Hughes dominated and controlled the Trust. Her conduct, therefore, is imputable to the Trust; not doing so would give trusts more insulation than those persons who control them, thus creating "an unjustified means of circumventing the securities laws." *Ballesteros*, 253 F. Supp. 2d at 730 n.9. As a result, this Court **GRANTS** summary judgment in favor of the SEC against the Trust as to Count I.

### C.  Count II Against Blackwell

The Commission also requests that this Court grant summary judgment on Count II against Blackwell for violating Section 16(a). "Section 16(a) of the Exchange Act and Rule 16a-2 thereunder require an officer or director of an issuer of a registered security to file with the Commission a statement indicating any changes of the insider's beneficial ownership of the issuer's equity securities during any month in which there has been a change within ten days after the close of the month." *SEC v. Blackwell*, 291 F.Supp.2d 673, 694 (S.D. Ohio 2003); 15 U.S.C. §78p(a). Rule 16a-1(a)(2) defines "beneficial owner" as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities" involved. 17 C.F.R. §240.16a-1. Rule 16a-1(a)(2) also defines "pecuniary interest" as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." *Id.*

21

This Court has opined previously that "Rule 16a-3 provides that an initial statement by an insider is to be made on Form 3 and subsequent statements of changes in beneficial ownership are to be made on Form 4 or Form 5." *Blackwell*, 291 F. Supp. 2d at 694; 17 C.F.R. § 240.16a-3. And "for trustees who are subject to Section 16, Rule 16a-8(b)(2) requires trust transactions to be attributed to the trustee and reported by him in his individual capacity when at least one beneficiary of the trust is an immediate family member of the trustee." *Id.*; 17 C.F.R. § 240.16a-8. A beneficial owner may not, however, be held liable for a Section 16(a) violation if his failure to file the appropriate forms is inadvertent. *See Blackwell*, 291 F. Supp. 2d at 695. Additionally, Section 16(a) is a strict liability rule than can be proved through a showing of wilful blindness. *See id.*

In total, to establish that Blackwell violated Section 16(a), the SEC must prove that: 1) Blackwell was subject to the disclosure requirements of Section 16(a); 2) he had a beneficial change in ownership; 3) he did not file a Form 4 or 5 disclosing that change in beneficial ownership; and 4) his failure to do so was not inadvertent.

The SEC alleges that Blackwell violated Section 16(a) in two different instances. The SEC alleges that Blackwell violated 16(a) by failing to report the Worthington stock purchases of the Trust and of Black-Jack.

### 1. Blackwell Was Subject to the Disclosure Requirements of Section 16(a)

As a director of Worthington, it is undisputed that Blackwell was subject to the disclosure requirements of Section 16(a). In 1999, Blackwell filed Forms 4 and 5 with respect to several other issuers.

## 2.  Blackwell Had a Beneficial Change in Ownership

The Court will analyze the Trust stock purchase and the Black-Jack stock purchase separately for the purposes of the second prong of the Section 16(a) analysis.  It is clear that Blackwell had a change in beneficial ownership with respect to the Trust purchase of Worthington stock for two reasons.  First, "Rule 16a-8(b)(2) requires trust transactions to be attributed to the trustee and reported by him in his individual capacity when at least one beneficiary of the trust is an immediate family member of the trustee." *Blackwell*, 291 F. Supp. 2d at 694; 17 C.F.R. § 240.16a-8.  Blackwell is a trustee of the Trust.  In 1999, his wife was a vested beneficiary of the Trust.  Thus, Blackwell was a beneficial owner and was required to disclose the Trust's purchase of Worthington stock.  Second, Blackwell's company, Blackwell & Associates, of which he was president and sole shareholder, owned any amount of money that the Trust was overfunded.  Thus, as an indirect beneficiary of the Trust, Blackwell had a obligation to report the Trust's purchase of Worthington stock.

The SEC alleges that Blackwell was a beneficial owner with respect to Black-Jack because he was a general partner and 50% owner of the company.  As such, the SEC asserts that he had a direct pecuniary interest in Black-Jack's illicit purchases of Worthington common stock.  If the SEC is correct, Blackwell had a obligation under Section 16(a) to report these purchases.  Blackwell counters that Black-Jack is completely controlled by Jack, Blackwell never received any profit from Black-Jack, and Blackwell did not have trading authority for Black-Jack. Consequent, Blackwell asserts that he is at best a nominal owner of Black-Jack, and therefore does not have a pecuniary interest in the company.

In Blackwell's answer to the complaint, he admits being a general partner and 50%

owner of Black-Jack.  The Court finds this admission telling.  All Blackwall must have is a

"direct or indirect" pecuniary interest in Black-Jack for purposes of Section 16(a).  A pecuniary

interest can merely be an "opportunity" to share in the profit of a corporation.  As a general

partner and 50% equity owner of Black-Jack, Blackwell certainly has the opportunity to share in

its profits, despite the fact that he may not have done so to this date.  Indeed, there is no evidence

to suggest that he does not have such an opportunity.  This Court, therefore, finds that Blackwell

was a beneficial owner of both the Trust and Black-Jack for the purpose of the reporting

requirements of Section 16(a).

### 3.  Blackwell Did Not File the Requisite Forms

The SEC has introduced the affidavit of its custodian of records indicating that Blackwell

has failed to turn in the required forms for both the trades placed by the Trust and the trades

placed by Black-Jack.  Blackwell does not dispute this in his brief.

### 4.  Blackwell's Inadvertent Failure to File Forms 4 and 5

Blackwell asserts that his failure to file the appropriate forms was inadvertent.

Specifically, Blackwell claims that: (1) he did not know about the Black-Jack or Trust purchases

of Worthington stock during the Kellogg Window; (2) he did not receive any account statements

from the Trust or Black-Jack; (3) he did not receive any Black-Jack tax filings; (4) he asserts no

investment control over Black-Jack; and (5) he did not receive any profits from Black-Jack.

Blackwell claims these facts illustrate that his failure to file was inadvertent.  In general, he

claims that he did not know of either of these transactions and therefore did not have reason to

think he had to file the Section 16(a) forms.  *See Wilson v. Seiter*, 893 F.2d 861, 866 (6th Cir.

1990) (noting that state of mind is typically not a proper issue for resolution on summary

24

judgment).

The SEC offers evidence that Blackwell's failure to file the required forms was either purposeful or a result of willful blindness. The SEC has provided copies of Advest and other account statements that relate to the Trust's Worthington stock trades. These statements have Blackwell & Associate's mailing address on them. These statements indicate that in September 1999, investments in Worthington stock make up approximately 21.5% of the Trust's assets. Additionally, Blackwell had submitted Forms 4 and 5 for Trust transactions relating to other securities. Blackwell's self-serving statements that he did not receive or read these statements do not effectively counter the SEC's willful blindness argument. As sole trustee of the Trust, one of Blackwell's most basic responsibilities is to manage the Trust's assets. Not knowing that over 20% of the Trust's assets is sitting in one particular stock, a stock belonging to a company on whose board he just happens to sit, violates this basic responsibility. This Court concludes, therefore, with respect to the Trust, that Blackwell was at a minimum willfully blind to the illicit Worthington transactions. Hence, Blackwell's failure to file the Section 16(a) forms relating to the Trust's Worthington transactions was not inadvertent.

There is also evidence that Blackwell's failure to file the Section 16(a) relating to the Black-Jack Worthington stock purchases was not inadvertent. Blackwell's secretary testified that Blackwell received Black-Jack's account statements at his office. The SEC provided copies of the relevant account statements which are addressed to Black-Jack Enterprises. In his deposition, Blackwell admits that copies of these account statements were filed in his office. Furthermore, Blackwell's accountant receives a K-1 tax form from Black-Jack annually.

Despite this evidence, the SEC is not able to meet the summary judgment standard on

Count II with respect to the Black-Jack trades. Because Blackwell owed no duty to Black-Jack — as he did the to the Trust — to read the account statements, the SEC cannot sustain its willful blindness argument. Blackwell's uncontroverted, but self-serving statement that he did not read the Black-Jack financial statements, which the Court must accept as true, is enough to render it inappropriate for this Court to grant summary judgment to the SEC with respect to the 16(a) reporting requirements as it relates to the Black-Jack transactions.

The SEC argues that a violation of Rule 16(a) is a strict liability offense. While the violation as a whole is a strict liability offense, extending strict liability to the inadvertence prong of this test would have the affect of eliminating this prong altogether. This Court in *SEC v. Blackwell*, 291 F.Supp.2d 673, 695, noted that the SEC did not have to show the Defendant's knowledge of the transactions in question to sustain a claim for a violation of Section 16(a) ("As to the trades made by Black-Jack, the SEC's allegations that Blackwell routinely received brokerage account statements and trade confirmations is sufficient to create an inference that he actually knew about the purchases of Worthington stock that Defendant Jack effected on behalf of Black-Jack. At the very least, the Complaint raises an inference of negligence, which, in the absence of a scienter requirement, is sufficient to state a claim for violation of Section 16(a)"). The SEC, however, has not adequately refuted Blackwell's contention that he never traded on behalf of Black-Jack and that he never received any profits from its transactions. If these contentions are true, Blackwell would not be negligent in failing to read Black-Jack's account statements. Accordingly, his argument that is failure to file was inadvertent is properly a question of fact to be decided by a jury.

The SEC further argues that allowing a director to claim ignorance of the existence of

26

trades that enure to his benefit would allow the director to escape liability for violations of Section 16(a). The Court disagrees. First, it is would be extremely rare that a director's inadvertence argument would prove successful. In many instances, including the cases cited by the SEC such as *SEC v. World-Wide Coin Investment, Ltd.*, 567 F.Supp. 724 (N.D. Ga. 1983), the director's illicit trades are solely personal. Even if a director gives a broker complete autonomous control over the director's personal trades, the fact that the money goes solely to the director means that an inadvertence argument would fail. Second, where an entity in which a director has a personal interest conducts the trades in question, the SEC could defeat the director's inadvertence argument by showing that the director was willfully blind. In this case, the SEC has failed to prove that the money from the Worthington trades ever ended up in Blackwell's bank account. Furthermore, while Black-Jack account statements were found in his office, they failed to prove that Blackwell had a habit of reading these statements. Had Blackwell been an active trader or an otherwise active participant in Black-Jack, the SEC's willful blindness argument would be more compelling.

The SEC has not proven that Blackwell knew of any trades conducted by Black-Jack nor have they proven that Blackwell received money from Black-Jack from trades that it conducted in an around the time period of the Worthington incident. Moreover, had the SEC proven at the criminal trial that Blackwell tipped Jack and/or Black-Jack about the Worthington merger, then it would follow that Blackwell should have known that Black-Jack would trade on that information. Thus, it would follow that any subsequent failure to report Black-Jack's Worthington trades was not inadvertent. The SEC has not yet established, however, that Blackwell or Black-Jack has any criminal or civil liability in regards to Black-Jack's purchase of

Worthington securities. Third, allowing a director to claim inadvertence does not allow him to escape liability; rather, it puts the issue before a jury. In this case, the SEC has not put forth evidence that shows the Blackwell knew or should have known about Black-Jack's Worthington trades. The Court, therefore, finds that there is still an issue of material fact regarding whether Blackwell's failure to file the requisite Section 16(a) forms for Black-Jack's Worthington trades was inadvertent.

### 5. Blackwell's Other Arguments

Blackwell also makes several other arguments, none of which has any merit. First, Blackwell argues that this Court should dismiss Count II as moot if it grants summary judgment to the SEC on Count I. Blackwell claims that Section 16(a) provides no additional remedies to the SEC beyond what are available for the Section 10(b) violations. Thus, Blackwell argues that there is no need for this Court to determine Blackwell's liability under 16(a). In support of this theory, Blackwell cites a litany of cases in which the court concluded that once full disgorgement has been made under Section 10(b), there is no basis to order disgorgement under Section 16(b). *See, e.g., Pappas v. Moss*, 303 F. Supp. 1257 (D.N.J. 1969); *Abbe v. Goss*, 411 F. Supp. 923 (S.D.N.Y. 1975); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 734 F. Supp. 1071 (S.D.N.Y. 1990).

Blackwell makes one fundamental error that is fatal to his argument. All the cases he cites refer to are Section 16(b) and not Section 16(a), the section at issue in this case. Indeed, "Congress intended §16(a) to deter a wider range of insider actions not covered by the much narrower scope of §16(b)." *C.R.A. Realty Corp. v. Goodyear Tire & Rubber Co.*, 705 F. Supp. 972, 979 (S.D.N.Y. 1989). Blackwell fails to point to any persuasive authority that supports his

28

position that once a Defendant has been found liable under Section 10(b) and paid damages

thereunder, a court cannot also award damages under Section 16(a).

In this case, the SEC seeks injunctions against Blackwell for violating both Section 10(b)

and Section 16(a).  These injunctions would serve to deter completely different conduct.  The

injunction for Section 10(b) would deter Blackwell from committing any future insider trading

violations and the injunction for Section 16(a) would deter Blackwell from failing to report

beneficial trades.  *See SEC v. Paul*, 2005 WL 1774054 at *2 (C.D. Cal. Jul. 20, 2005).

Moreover, Section 21(d) of the Exchange Act permits a court to impose civil penalties for *any*

violations of the Exchange Act.  15 U.S.C. §78u.  Hence, this Court rejects Defendants'

argument that it should render Count II moot.

In his second argument, Blackwell contends that Section 16(a) is a remedial section and

does not provide for civil penalties.  Once again, all the cases that Blackwell cites to support this

position refer to Section 16(b) and not Section 16(a).  Moreover, the Commission is not currently

seeking civil penalties against Blackwell for violation of Section 16(a).  Rather, the Commission

asks the court to enjoin Blackwell from violating Section 16(a) and reserves the right to pursue

civil penalties against all Defendants at a later date.  This Court finds that it need not address the

question of whether the SEC is entitled to civil penalties against Defendants at this time.

As his third argument, Blackwell contends that excluding the Trust and the Black-Jack

trades from the requirements of Section 16 is consistent with its legislative purpose.

Specifically, Blackwell contends that Section 16 was designed to prevent the failure of an

individual to report *personal purchases*, not institutional ones.  Blackwell again relies on Section

16(b) cases.  In one particularly inapplicable quote referring to section 16(b)'s prohibition on

certain short-swing profits, Blackwell notes that whether a transaction falls within the scope of Section 16(b) ultimately turns on "whether the transaction may serve as a vehicle for the evil which Congress sought to prevent."  *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594 (1973).  While this Court realizes that any analysis under Section 16(b) is wholly inappropriate in this case, it finds this quote quite apropos.  This Court believes that attempting to cover up one's insider trading activity by failing to submit the required forms is exactly the type of evil that Congress intended Section 16 to prevent.

Finally, Blackwell argues that he is protected by the Safe Harbor provision in Rule 16a-1(a)(2)(iii) as it relates to his liability under Section 16(a) for the Black-Jack trades.  *See* 17 C.F.R. §240.16a-1(a)(2)(iii).  While the Court need not resolve this argument because it held that summary judgment is inappropriate against Blackwell as relates to the Black-Jack trades, given that this rule of law may become an issue at trial, it chooses to decide the issue now.  The Safe Harbor Rule states that a shareholder is not deemed to have a pecuniary interest in a corporation "if the shareholder is not a controlling shareholder of the entity and does not have or share investment control over the entity's portfolio." *Id.*  Blackwell argues that the record has not established that he had any investment control in Black-Jack nor that he was a controlling shareholder.

Blackwell is incorrect for two reasons.  As a threshold matter, an insider who is a general partner of a partnership is deemed to have a pecuniary interest in the partnership's portfolio securities.  *See* 17 C.F.R. § 240.16a-1(a)(2)(ii)(B).  Blackwell, in his answer to the SEC's complaint, stated that he was a general partner of Blackwell.  He is now estopped from stating otherwise.  Second, the Safe Harbor Rule was designed to protect officers of issuers who

30

happened also to be minor shareholders in other entities that own the issuer's securities in its portfolios. The Safe Harbor Rule was designed to protect those shareholders who did not have enough equity in the company to exercise control over the corporation. *See Feder v. Frost*, 220 F.3d 29, 35 (2d Cir. 2000). It was not designed to exempt a director who was one of two equal partners. Rule 12b-2 defines "controlling" as "the possession, direct or indirect, of the power" to direct the management or policies of a company. 17 C.F.R. §240.12b-2. Blackwell is a 50% shareholder in Black-Jack and therefore this court finds that he has a controlling interest. Given that Blackwell both has a controlling interest and is a general partner of Black-Jack, he may not shield himself under the veil of the Safe Harbor Rule.

In summary, the court **GRANTS** summary judgment to the SEC and against Blackwell on Count II as it applies to the Trust's trades but **DENIES** summary judgment with respect to the Black-Jack trades.

### D.  Injunctions Against Blackwell, Hughes, Stacy, and the Trust

The SEC asks this Court permanently to enjoin Defendants Blackwell, Hughes, Stacy, and the Trust from violating the Exchange Act or any rules promulgated by the Commission under the authority of the Exchange Act. More specifically, they request that this Court enjoin all Defendants from violating Section 10(b) and Defendant Blackwell from violating Section 16(a).

Permanent injunctions are one tool that the SEC uses to prevent future securities fraud. A permanent injunction merely prohibits defendants from violating securities laws, something that they are required to do anyway. Injunctions ease the Commission's access to the court because they permit the Commission to forgo certain administrative requirements that might

31

delay the commencement of future actions.  They also allow the Commission to bring an action for contempt against any defendants who violate the Court's injunction.

The Court's ability to impose an injunction is statutory: "in an action for statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future violations in order to obtain [injunctive] relief."  *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982) (citations omitted); Section 21(d) of the Exchange Act; *SEC v. Blavin*, 557 F. Supp. 1304, 1315 (E.D. Mich. 1983), *aff'd*, 760 F.2d 706 (6th Cir. 1985).  In assessing whether there is a likelihood of future violations, the Court must look at the totality of the circumstances.  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *Holschuh*, 694 F.2d at 144.

In examining the totality of the circumstances, the Court should pay special attention to seven factors: (1) the egregiousness of the violations, (2) the isolated or repeated nature of the violations, (3) the degree of scienter involved, (4) the sincerity of the defendants' assurances, if any, against future violations; (5) defendants' recognition of the wrongful nature of their conduct; (6) likelihood that defendant's occupation will present opportunities, or lack thereof, for future violations; and (7) defendant's age and health.  *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984).  No one factor is dispositive and the court should weight each factor in light of the surrounding circumstances of the violation.  *See id.*  Moreover, the Court is "vested with broad discretion in deciding whether to grant injunctive relief."  *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 424 (D. Md. 2005).  On several previous occasions, courts have awarded injunctive relief to the SEC after it has used collateral estoppel based on criminal convictions.  *See SEC v. Bilzerian*, 29 F.3d 689 (D.D.C. Cir. 1994); *SEC v. Gruenberg*, 989 F.2d 977 (8th Cir. 1993); *SEC v.*

*Grossman*, 887 F.Supp. 649 (S.D.N.Y. 1995).

It is clear that Blackwell's conduct was egregious.  During the criminal sentencing, Judge Graham noted that Blackwell was convicted of thirteen separate counts of insider trading, violated his fiduciary duties to Worthington, undermined the integrity of our national markets, obstructed justice, and lied in his testimony before the SEC.[9]  The fact that Blackwell did not personally trade on inside information does not make his conduct less egregious.  In fact, "the tipper's conduct, almost invariably, is more culpable than that of the tippee."  *SEC v. Tome*, 638 F. Supp. 596, 617 (S.D.N.Y. 1986) referencing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985).

Moreover, there is evidence that these events were not isolated.  Blackwell, Hughes, and Stacy engaged in at least thirteen different instances of insider trading over a period lasting approximately two months.  Hughes and Stacy made five separate purchases of Worthington stock.  In total, they purchased over 10,000 shares of Worthing stock which required them to invest over 150% of their combined annual income in one month.

On the other hand, Blackwell has had an extraordinary career filled with years of public service and philanthropy, and this appears to be his first violation of securities law.  Blackwell relies on *SEC v. Ingram,* 694 F. Supp.1437 (C.D. Cal.1988), in which the court declined to grant an injunction against a broker who had an unblemished record for 19 years, as authority upon which this Court should rely in determining that an injunction is not warranted in this case. While the Court in *Ingram* refused to grant a permanent injunction, it relied on the seven factor test as a whole, and not simply the one point Blackwell chooses to note.  *Id.* at 1442.

---

[9]From Judge Graham's Sentencing Opinion and Order.

Specifically, the *Ingram* court also found that evidence of the defendant's scienter was weak and that he appeared repentant and contrite. *Id.*

Unlike *Ingram*, the degree of scienter in this case is nothing if not compelling. Blackwell worked assiduously to inform multiple persons and organizations of the impending Worthington merger. Hughes and Stacy risked their entire savings to invest in one single stock, illustrating that they had inside information on which to base this decision. Based on the overwhelming evidence upon which the jury relied in finding Defendants guilty of Section 10(b) violations, it is obvious that Defendants knew the actions they were taking constituted a violation of securities laws.

In addition, Defendants have not made any assurances that they will not violate securities laws in the future nor have they acknowledged the wrongfulness of their actions. Defendants state that they should not be punished for asserting their innocence. They fail, however, to realize that since the law only presumes that they are innocent until proven guilty, and they have been proven guilty in the Criminal Action, this Court not longer considers them innocent. Moreover, the *Youmans* factors specifically require that this Court examine whether Defendants are contrite. They are not. A "court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable." *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996) (citation omitted).

The last two factors present closer questions. Defendants will all be incarcerated for the next several years. When Blackwell emerges from prison, he still will have net worth of approximately $8 million and a lifetime's worth of business connections which he made while a tenured professor at Ohio State and a member of numerous corporate boards. On the other hand,

34

he will be almost 70 years old when he is released.  After Hughes and Stacy finish their sentence, they will likely be practically impecunious.  Nonetheless, they will still be relatively young and will retain the possibility of reestablishing themselves in the business community upon release.

Defendants raise several noteworthy points in their opposition memoranda.  They comment that Judge Graham, in speaking about the length of Blackwell's sentence, notes that he doubts that "Blackwell will ever engage in activities of this kind [again], or even have the opportunity to do so."[10]   This Court notes, however, that Judge Graham was not making these comments while employing the seven factor test delineated above, nor was he commenting directly on whether a civil injunction was appropriate.  Moreover, courts have imposed permanent injunctions while defendants were serving terms of incarceration.  *See, e.g., SEC v. Tandem Management*, 2001 WL 1488218 at *13 (S.D.N.Y. Nov. 21, 2001).

Defendants also comment that several of the facts that the SEC uses to illustrate that this Court should impose an injunction against Defendants have not been adjudicated.  For example, the SEC alleges that Blackwell provided Hughes with a $30,000 loan to commit insider trading. Defendants are correct.  The SEC makes several factual allegations in its brief which were not completely necessary to the jury verdicts in the Criminal Action and are still in dispute by the parties.  The Court, however, has disregarded the portions of the SEC's arguments which are in dispute, and rests its decisions on either undisputed facts, facts which have been conclusively established in the Criminal Action, or facts which the SEC has shown to be conclusive in their papers, all the time viewing the evidence in the light most favorable to Defendants.

Additionally, Blackwell cites *Sargent* for the proposition that a defendant's violation of

---

[10]Sentencing Hearing Transcript at 49

35

Section 10(b) is not egregious if the defendant neither traded on nor derived any profit from the inside information.  *See SEC v. Sargent*, 329 F.3d 34 (1st Cir. 2003).  While the court in *Sergant* did decline to issue an injunction against a Section 10(b) defendant, it did so after examining all of the *Youmans* factors.  The court found, among other things, that the defendant's current employment did not lend itself to insider trading and that his "acceptance of the jury verdict without further appeal is sufficient acknowledgment of the wrongfulness of his conduct." *Id* at 40.  Simply put, *Sargent* is not factually analogous to this case.

Examining the seven *Youmans* factors as a whole, this Court finds that there is a likelihood that Blackwell, Hughes, and Stacy may commit a securities violation in the future such that it is appropriate permanently to enjoin them from violating the Exchange Act. Specifically, this Court finds that their conduct was egregious, they acted with scienter, they have not acknowledged the wrongfulness of their actions, and that Defendants have made no assurances that they will not commit securities violations in the future.  This Court, therefore, **GRANTS** the SEC's request for permanent injunctions against Blackwell, Hughes, and Stacy, enjoining them from committing future violations of Section 10(b).  This Court also **GRANTS** the SEC's request for an injunction against Blackwell, enjoining him from violating Section 16(a).  This Court has already entered summary judgment against Blackwell on the issue of his Section 16(a) liability.  Despite having changes in beneficial ownership of Worthington stock, Blackwell failed to disclose the Trust or Black-Jack's purchases, thus making it less likely that his insider trading activities would be discovered.  An injunction is appropriate.

The SEC also asks this Court to enjoin the Trust from violating Section 10(b).  The SEC notes that several courts have enjoined corporate entities from violating securities laws after the

courts imputed the actions of fiduciaries to the entities in question.  *See, e.g., SEC v. Infinity Group Co.*, 212 F.3d 180, 198 (3d Cir. 2000); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972).  Blackwell and Hughes continue their association with the Trust and, as such, the SEC believes that an injunction against the Trust is appropriate.  The Court disagrees.  People control trusts.  The Court used this logic to impute Hughes' conduct to the Trust.  The Court is satisfied that the injunctions it issues against Blackwell and Hughes, the trustee and primary manger of the Trust, which prohibit them from violating Section 10(b), will serve the same purpose as enjoining the Trust itself.  Moreover, the Court is concerned that a direct injunction against the Trust may serve to penalize its beneficiaries or other fiduciaries that were not culpable for the insider trading at question in this case.  As a result, this Court **DENIES** the SEC's request to issue a permanent injunction against the Trust.

### E.  Disgorgement Orders Against Blackwell, Hughes, Stacy, and the Trust

The SEC asks this Court to enter disgorgement orders in the amount of $104,954.72 against Blackwell, Hughes, and Stacy, jointly and severally, which represents the amount of profit Hughes and Stacy made on the illicit Worthington stock trades, and $57,023.29 against Blackwell and the Trust, jointly and severally, which represents the amount of profit the Trust made on the illicit Worthington stock trades.

The power of this Court to order disgorgement of insider trading profits arises from the general equity powers conferred to it by securities law.  *See, e.g., SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1307 (2d Cir. 1971); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) ("Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an

appropriate remedy."). Thus, this Court has the equitable power to order, or to choose not to order, Defendants to disgorge their insider trading profits.

The purpose of disgorgement is to "force 'a defendant to give up the amount by which he was unjustly enriched' rather than to compensate the victims of fraud." *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985) citing *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978). Thus, "once the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement," and the court need not identify the private parties damaged by the fraud. *Id.*; *see also SEC v. Washington County Utility District*, 676 F.2d 218, 227 (6th Cir. 1982). Disgorgement, however, may not be used punitively. *Bilzerian*, 814 F. Supp. at 120.

If the Court chooses to order disgorgement, all doubts concerning the amount of disgorgement "are to be resolved against the defrauding party." *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D. Mich. 1991) citing *SEC v. First Financial Ltd.*, 688 F. Supp. 705, 727 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989). All the SEC must show is that the amount of disgorgement it requests is a "reasonable approximation of profits casually connected to the violation." *First Financial*, 890 F.2d at 1231.

The Commission argues that a defendant is required to disgorge the entire amount of profits he illicitly received. This is not a complete statement of the law; a court is not required to order disgorgement, rather, "in the exercise of its equity powers a court *may* order disgorgement of profits acquired through securities fraud.*" SEC v. Midwest Investments, Inc.*, 1996 U.S. App. LEXIS 14424, *21 (6th Cir. May 6, 1996) (emphasis added) quoting *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir.

1996) ("The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged.")  Nonetheless, in calculating "the amount of money that a defendant must disgorge, the Sixth Circuit has held, by implication, that the entire amount of profits which were illicitly received must be disgorged." *Great Lakes*, 775 F. Supp. at 214 relying on *Blavin*, 760 F.2d at 710 (6th Cir. 1985).

Federal courts have routinely ordered disgorgement of insider trading profits to ensure that defendants are not unjustly enriched by their illegal actions.  *See, e.g., Blavin*, 760 F.2d at 710; *Washington County*, 676 F.2d at 222; *SEC v. Freeman*, 290 F. Supp.2d 401, 406 (S.D.N.Y. 2003).  The purpose of disgorgement is to force defendants to return their illicit profits rather than to punish them.  The typical amount of a disgorgement order is the amount of profit generated by the insider trading.  *See First City*, 890 F.2d at 1212.   The SEC requests this Court to order Blackwell, Hughes and Stacy to disgorge $104, 954.72, and Blackwell and the Trust to disgorge $51,363.49, which represents the profit generated by the illicit Worthington trades.

Defendants make several arguments suggesting that this Court should not order disgorgement.  First, Blackwell did not personally profit from the Worthington trades, (i.e. he was not "enriched"), and as a result, he argues that this Court should not order him to disgorge profits that appropriately belong to Hughes, Stacy, and the Trust.  This argument is unavailing because a "tippee's gains are attributable to the tipper, regardless [of] whether benefit accrues to the tipper." *SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998).  As a result, courts have often held tippers and tippees jointly liable for disgorgement.  *See, e.g., id.*, *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990); *SEC v. Tome*, 638 F. Supp. 638, 639 (S.D.N.Y. 1986).

Defendants next argue that the Court should offset the criminal fines that Defendants

received in the Criminal Action against the disgorgement amount requested by the SEC.  In the

Criminal Action, Judge Graham fined Blackwell $1,000,000, which was an upward departure

from the sentencing guidelines.  He also fined Hughes and Stacy a combined $106,886.00.

Defendants' argument has two connotations.  First, Defendants attempt to argue from

*SEC v. Palmisano*, 135 F.3d 860, 863 (2d Cir. 1998), that this Court should directly offset the

criminal fine against any disgorgement order.  *Palmisano* is inapposite because the criminal fine

in *Palmisano* was a "criminal restitution order"and not a "criminal fine"as Judge Graham

imposed in the Criminal Action.[11]  Disgorgement is remedial in nature whereas a fine is punitive

in nature; they serve different purposes.  *See Bilzerian*, 29 F.2d at 696.  Courts in similar

circumstances have refused to credit criminal fines against disgorgement orders.  *See, e.g., SEC*

*v. Svoboda*, 409 F. Supp. 2d 331, 344. N.4. (S.D.N.Y. 2006); *Bilzerian*, 814 F. Supp. 116, 120

(D.D.C. 1993).  Because, definitionally, a fine is purely punitive, Defendants still retain their

insider trading profits even after they have been fined.  Thus, their first argument fails.

Second, Defendants argue that this court *may* offset a criminal fine against a

disgorgement order if it finds that the criminal fine either served the same purpose as the

requested disgorgement, or that the criminal fine was intended to be, at least in part,

restitutionary in nature.  In support of these propositions, Defendants rely on *SEC v. Monarch*

*Funding Corp.*, 1996 U.S. Dist. LEXIS 8756 at *35 (S.D.N.Y. June 24, 2996).  In *Monarch*, the

SEC sought disgorgement in the amount of $1,566,000 against defendant Bertoli ("Bertoli")

even though in a prior criminal action, Bertoli was assessed a $100,000 criminal fine.  The court

---

[11]Defendants string cite many other cases which are similar to *Palmisano*.  In all of these
cases, the criminal court imposed some sort of restitution order and not a criminal fine or penalty
as Judge Graham did in this case.

40

rejected Bertoli's contention that disgorgement would violate the constitution's prohibition against double jeopardy because disgorgement is not punitive in nature.  *Id.* at *34.  Nonetheless, the court found that the criminal court judge, in constructing Bertoli's criminal fine, contemplated the interaction between civil and criminal penalties and incorporated a restitutionary element into it.  *Id.* at *35.  While the criminal court did not specifically apportion the fine between a criminal penalty and a restitutionary measure, the civil court gave Bertoli "the benefit of the doubt" and treated the entire $100,000 as a restitutionary measure, and thus ordered disgorgement in the amount of only $1,466,000.  *Id.* at *36.

Defendants ask this Court to follow the logic in *Monarch* and reduce the requested disgorgement amounts by the amount of the criminal fines Judge Graham levied against them. Defendants assert that Judge Graham, in assessing the criminal fines against Defendants, intended the fines to have a restitutionary effect.  In support of this assertion, they point to several facts.  First, the fine against Hughes and Stacy was set at $106,886.00, almost the exact amount of profit that the SEC asks that they disgorge ($104,954.72).  Second, in departing upwardly from the Sentencing Guidelines, Judge Graham commented that he was examining "the amount of gain to [Blackwell and his] co-conspirators. And I have ruled that in this case, the amount of the gain was approximately one million dollars."[12]  He also commented that an upward departure from the Sentencing Guidelines was appropriate to "ensure both the disgorgement of any gain from the offense and . . . [to ensure] an adequate punitive fine." Blackwell further comments that no court has ever levied a civil disgorgement against a

---

[12]The $1M gain represented the profits of Hughes and Stacy as well as unindicted co-conspirators and defendants that were acquitted in the Criminal Action.

defendant who had already received a fine in excess of the amount of disgorgement requested. Defendants Hughes and Stacy also contend that expenses from the criminal trial left them indigent and, as a result, any disgorgement order would only serve to penalize them.

In its reply brief, the SEC reasserts that the existence of criminal penalties does not preclude this Court from ordering Defendants to disgorge their illicit gains. The SEC further contends that Judge Graham was not contemplating disgorgement or restitution when he fined Defendants; rather, the SEC maintains that Judge Graham used the amount of trading profits as a benchmark in setting the penalty. Further, the SEC contends that Judge Graham set Blackwell's fine at $1M, an amount that exceeds his and all other Defendants' gains, specifically in an effort to punish him. The SEC also asseverates that Blackwell used the reverse argument at his sentencing hearing; i.e. he argued that a criminal fine should not be levied against him because there would inevitably a disgorgement order in the civil proceeding. Finally, the SEC points out that *Monarch* is in direct conflict with numerous opinions in which federal courts imposed disgorgement even though a criminal fine had already been ordered.

Defendants further contend that imposing a disgorgement order on top of a criminal fine would be unconstitutional because it would violate both the Double Jeopardy Clause and the Eighth Amendment's Excessive Fines Clause. This argument has no merit. It is well established that disgorgement orders are remedial, and not punitive; as such, federal courts have, on many occasions, rejected the argument that disgorgement orders violate the Double Jeopardy Clause. *See, e.g., In re Bilzerian*, 153 F.3d 1278, 1283 (11th Cir. 1998); *Bilzerian*, 814 F. Supp. at 120; *Monarch*, 1996 U.S. Dist. LEXIS 8756 at *35. Defendants' contention that a disgorgement order would violate the Excessive Fines Clause is similarly disingenuous. Disgorgement is not a

fine.

In summary, the Court finds that offsetting a criminal fine against a disgorgement order would obviate the purpose of a leveling the fine. A criminal fine is punitive. Disgorgement is restitutionary. Allowing the fine to count toward the disgorgement order removes the punitive nature of the fine. Defendants have been ordered to pay a criminal fine but have yet to disgorge their illicit profits. As such, the Court **GRANTS** the SEC's request for disgorgement and orders that Blackwell, Hughes, and Stacy, jointly and severally, disgorge their profits in the amount of $104,954.72;

Lastly, the Court notes that the Trust has not been the subject of a criminal fine. As such, a disgorgement order against the Trust is appropriate. At oral argument, the Trust relied on *Giacobetti v. Insurance Placement Facility of Pennsylvania*, 500 Pa. 447 (1983) in support of its contention that the actions of a person controlling the trust should not be imputed to the Trust itself for the purposes of disgorgement. In *Giacobetti*, a co-trustee of a family trust burned down a grocery store which was one of the properties owned by the family trust. The Pennsylvania Supreme Court held that while the co-trustee could not profit from the fire insurance proceeds, the remaining beneficiaries were entitled to them. This case is not analogous to *Giacobetti*. In *Giacobetti*, the insurance proceeds replaced property belonging to the trust. The co-trustee damaged the trust by burning its property and the insurance simply replaced what the co-trustee had taken from the trust. In this case, the Trust's $57,023.29 profit from the Worthington trades never legally belonged to the Trust. Therefore, a disgorgement order is appropriate against the Trust to prevent it from illegally profiting from its Worthington stock trades. The Court finds no justification for allowing the Trust profit from the illegal conduct of its fiduciaries when it was

43

never entitled to the funds in question.  Therefore, this Court **GRANTS** the SEC's request for disgorgement against the Trust and enters a disgorgement order against Blackwell and the Trust, jointly and severally, in the amount of $57,023.29.

### F.  Prejudgment Interest

If the Court chooses to enter disgorgement orders against Defendants, the SEC contends that it is also appropriate to award prejudgment interest.  *See, e.g., SEC v. Stephenson*, 732 F. Supp. 438, 439 (S.D.N.Y. 1990) ("Parties trading on inside information are liable for prejudgment interest").  The Court should look to considerations of fairness and equity in determining whether to award prejudgment interest as well as the length of time the defendants retained the proceeds of the illicit transaction.  *Id.*  The purpose of prejudgment interest is to prevent a defendant from "obtaining the benefit of what amounts to an interest free loan" on the proceeds of an illegal activity.  *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  The calculation of prejudgment interest follows the delinquent tax rate for unpaid taxes as determined by the Internal Revenue Service, and is assessed on a quarterly basis.  *See First Jersey*, 101 F.3d 1450, 1476 (2d Cir. 1996).  The SEC has submitted the appropriate materials to establish that $51,363.49 is the correct amount of prejudgment interest on the Hughes and Stacy trades and $27,906.47 is the correct amount of prejudgment interest on the Trust trades.

Defendants do not dispute that the Court has the power to award prejudgment interest. Rather, they ask the Court to exercise its discretion not to award interest, according to the considerations of fairness. *See SEC v. Roor*, 2004 U.S. Dist. LEXIS 17416 at *34 (S.D.N.Y. Aug. 30, 2004) ("An award of prejudgment interest lies within the sound discretion of the Court.")  Blackwell contends that he, as a tipper, did not personally profit from the Worthington

transactions.  Since he did not have access to the illegal funds, Blackwell contends that it would

be unfair to charge him interest on it.  Blackwell relies on *Sargent*, in which the First Circuit

commented that while "we might have reached a different result had we been the trial judge, we

cannot say that it constituted an abuse of discretion not to award prejudgment interest" against a

tipper.  *Sargent*, 329 F.3d at 41.

The SEC retorts that fairness dictates that prejudgment interest is appropriate against a

convicted felon who has refused to acknowledged the wrongfulness of his actions.  A Court may

award prejudgment interest against a tipper if the equities so dictate. *See, e.g., Tome*, 638 F.

Supp. At 639 (rejecting the argument that imposing prejudgment interest against a tipper

constituted an improper penalty.)  The "award of pre-judgment interest in a case involving

violations of the federal securities laws rests within the equitable discretion of the district court

to be exercised according to considerations of fairness." *Chris-Craft Industries, Inc. v. Piper*

*Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir.1975).

All Defendants benefitted, or intended to benefit, from the illicit Worthington trades.

They derived economic benefit from the interest they earned, or could have earned, on the illicit

proceeds of their insider trading.  Therefore, the considerations of equity and fairness dictate that

they pay prejudgment interest money they acquired.  Accordingly, the Court **GRANTS** the

SEC's request for an award of prejudgment interest.  The Court grants an award of prejudgment

interest against Blackwell, Hughes, and Stacy, jointly and severally, in the amount of $51,

363.49.  The Court also grants an award of prejudgment interest against Blackwell and the Trust,

jointly and severally, in the amount of $27,906.47.

### G. Civil Penalties and Officer-Director Bar

45

The Commission reserves the right to request civil penalties and an officer-director bar at a later date.  The Commission requests to wait until its remaining claims against Blackwell have been resolved before requesting this relief.  This Court acknowledges this request and allows the SEC to pursue these forms of relief upon resolution of the remainder of its claims.

### V. CONCLUSION

In summary, the Court **GRANTS in part** and **DENIES in part** the SEC's Motion for Partial Summary Judgment.  Specifically, the Court:

(1) **GRANTS** Summary Judgment against Blackwell, Hughes, and Stacy on Count I, liability for violating of Section 10(b);

(2) **GRANTS** Summary Judgment against the Trust on Count I, liability for violating of Section 10(b);

(3) **GRANTS** Summary Judgment against Blackwell on Count II, liability for violating Section 16(a) with respect to the Trust's illegal Worthington stock trades;

(4) **DENIES** Summary Judgment against Blackwell on Count II, liability for violating Section 16(a) with respect to the Black-Jack's allegedly illegal Worthington stock trades;

(5) **GRANTS** a permanent injunction against Blackwell, Hughes, and Stacy, enjoining them from violating Section 10(b) of the Securities act and any rules promulgated thereunder;

(6) **DENIES** a permanent injunction against the Trust;

(7) **GRANTS** a disgorgement order against Blackwell, Hughes, and Stacy, jointly and severally, in the amount of $104,954.72;

(8) **GRANTS** a disgorgement order against Blackwell and the Trust, jointly and

severally, in the amount of $57,023.29;

(9) **GRANTS** an award of prejudgment interest against Blackwell, Hughes, and Stacy,

jointly and severally, in the amount of $51, 363.49;

(10) **GRANTS** an award of prejudgment interest against Blackwell and the Trust, jointly

and severally, in the amount of $27,906.47 and;

(11) **GRANTS** the Commissions request to pursue civil penalties and an officer-director

bar at the conclusion of litigation of all claims against Blackwell.

      **IT IS SO ORDERED.**

                 **/s/ Algenon L. Marbley**
                 **ALGENON L. MARBLEY**
                 **UNITED STATES DISTRICT JUDGE**

**Dated: March 20, 2007**